# CIRCUIT COURT OF BALTIMORE CITY.

Filed July 13, 1922.

CAHN-COBLENS COMPANY

VS.

ABRAHAM EISENBERG AND HELEN EISENBERG, HIS WIFE.

*Randolph Barton, Jr.,* and *Leon E. Greenbaum* for plaintiff.

*Joseph C. France* and *Chas. McHenry Howard* for defendants.

**BOND, J.—**

As was said at the conclusion of the argument in this case, however desirable it may be that there be a re-examination of the question of the applicability of the ground rent redemption statutes to leases for the mere occupation of buildings, that re-examination should not be made by the judge of the lower court. The only question open to discussion here is whether the rule of Brager vs. Bingham, 127 Md. 148, is to be applied so as to require a redemption in the situation in which these parties stand. I have had the benefit of unusually able arguments on this, with many references to decisions upon various questions arising in the relation of landlord and tenant, and upon applications for enforcement of contracts in equity under various circumstances.

At the outset of the inquiry, I think it especially important to note that we may easily be led astray by too much dependence upon definitions and principles applied to relations and situations which differ from those of the parties here, although in external form they may be similar. Here we have to deal with a statute which has as its ultimate object a legal relation peculiar to the State of Maryland, although set up in a form familiar everywhere. While the originators of our ground rents made use of a form of lease, as if between an ordinary landlord and his tenant, it is well known to us all in Maryland that they in fact originated a form of investment, as Judge Miller states it in Banks vs. Haskie, 45 Md. 217, "to secure the prompt payment in perpetuity of the interest on a sum of money equivalent to the value of the property in fee, at the time the lease was made, and on the part of the lessee to acquire a perpetual interest in the leased premises, which would justify his making permanent improvements thereon, and enable him to avail himself of the value of the property thus enhanced, as well as of its increase in value arising from other causes." By enlarging and making over somewhat the form of a lease, they managed to contrive a permanent ownership of the land in the one in the position of lessee, coupled with a permanent charge or annuity in the one standing as fee simple owner or reversioner. On both sides were to be permanent owners, one of the land and the other of the charge. Permanent ownership, it may be said, was divided.

In course of time the continued creation of these perpetual investments came to be regarded as detrimental to the public welfare, and beginning with the Act of 1884, Chapter 485, the legislature, in a series of enactments, provided that the rent reserved might be redeemed, upon a specified capitalization, under any lease for a term of more than fifteen years. The statutory provision to this effect has been by way of a broad, succinct statement, for the redemption of "rents reserved" under "leases of land," and has not undertaken to provide qualifications and distinctions which are necessary to keep the statute within its purpose on the one hand, and to prevent evasions by avoidance of the strict letter on the other; and from this fact some important consequences have followed. In the interpretation and concrete application of a statute the function of a court varies according to the amount of the combined task performed by the legislature itself. Assuming there is a workable statute to begin with, then the courts have to do more or less in accomplishing the aim of the legislature according as the legislature has left them more or less to do. With this ground rent redemption statute the courts have had on a smaller scale much the same sort of function as that placed upon the Federal courts by the Sherman Anti-Trust Act.

Inevitably there soon arose a case outside the letter of the statute, but which seemed to the court to accomplish the mischief aimed at, and the court had to uphold the purpose against evasion by avoidance of the letter. Stewart vs. Gorter, 70 Md. 242. And cases arose which were within the letter but outside the purpose, and the task of the court was then to protect

from the letter. Walker vs. Washington Grove Association, 127 Md. 564; Buckler vs. Safe Deposit Co., 115 Md. 228. Land is leased for a great variety of uses (embankments, wharves, piers, ways, for example) and there are probably many other instances in which the courts would have to distinguish between the full letter and the purpose of the statute.

So in the interpretation and application of this statute to any concrete case, it would seem to be from the purpose primarily that we must take our law—indeed, almost entirely so, for definitions and interpretations follow rather from the aim of the statute.

There are several separate questions to be studied, and I take them up in what seems to me a convenient order.

First, as to the length of the existing tenancy under this lease. Is it now of such length as to be within the operation of the statute? The lease was made for an original term of ten years, and contained a covenant for renewal at the option of the lessee for another term of ten years with the same covenants. The statutory provision attaches a right of redemption to "all leases or sub-leases of land for a longer period than fifteen years." In Stewart vs. Gorter, 70 Md. 242, the Court of Appeals decided that a lease for a term of fourteen years with a covenant for renewals perpetually came within the provisions of that statute, and the similarity of the two cases in point of length of term, is apparent at once. It is suggested that the court was there dealing with a different case, however, in that the lease for fourteen years with a covenant which made it perpetual in effect was an obvious attempt at evasion of the purpose of the act, and that here we have a lease which provides for a sum total tenancy of twenty years at most, and is just as obviously not an attempt at evasion. I think it is true that in so far as the case is a different one it would be improper to carry out the statement of Judge Stone in its full breadth, without discrimination. But once we put aside the difference between a ground rent lease, and an ordinary lease between landlord and tenant for use and occupation of a building, there is little difference between the two leases, especially in respect to length of term. While Judge Stone did emphasize the fact that on his construction of the

lease in Stewart vs. Gorter it provided in effect for perpetual renewals, we must bear in mind that the statute did not stop with perpetual leases. It attached the right of redemption to leases for more than fifteen years, irrespective of any covenants for renewals beyond that period. And the question in both the case of Stewart vs. Gorter and the present case is the same: whether a lease for a shorter original term, renewable beyond a point fifteen years from the beginning, is a lease for more than fifteen years. I do not see that the possible perpetuity of the tenancy adds to the question, or helps to solve it.

And I do not see that the intention of the parties helps to determine whether the lease is or is not within the operation of the statute, for the Court of Appeals has definitely taken a stand on the principle that the statute reaches any arrangement which might yield a tenancy of the length stated. The construction follows from the purpose of the statute here, as it has followed in other cases elsewhere. In the second volume of his work on Landlord and Tenant, Sec. 219, Mr. Tiffany has said:

"In a number of cases the question has arisen whether a lease for a certain term, with a right of renewal for another term, was a lease for the sum of the two terms, for the purpose of determining whether it was within the operation of a particular statute. It has been decided, for the purpose of determining the applicability of a statute restricting the period for which a lease can be made, that the lease is invalid if the sum of the original term and the renewal term exceed the period named in the statute."

In the case of Moore vs. Clench, 1 Ch. Div. 447, 452, one of those cited by Mr. Tiffany, Jessel, M. R., had a somewhat similar question to deal with under a lease by certain trustees of a charity for a term of years, and during three certain lives, with a covenant for renewal by substituting lives beyond that. A statute of Elizabeth prohibited a lease of land by such trustees for more than twenty-one years and a lease of a house and grounds in town for more than forty years.

"This lease," said Jessel, "is therefore too long, for if the covenant to add another life is valid, it would be an equitable lease for more than three

lives, and therefore within the very mischief of the statute.

"The argument addressed to me was this: that you can sever the covenant from the lease so as to make it a separate covenant, which can be enforced at the expiration of the period for which the lease was granted. But the principle on which you can enforce the specific performance of such a covenant is, that it creates an equitable estate from the time of its execution. The argument, therefore, on which the claim to specific performance rests proves too much, for the equitable estate created by the covenant was created at the date of the original lease, and it was by the terms of the statute too long."

It may be added that it is questionable, at least, whether in strict accordance with the decision of our Court of Appeals the lease here and that in Stewart vs. Gorter can be said to differ in respect to the possibility of perpetual renewals. While it is doubtless true that the great weight of authority—the "universally recognized rule," says the editor of the article on Landlord and Tenant in 16 R. C. L., Sec. 391—is to the effect that a covenant for renewal of a lease with like covenants does not in equity keep repeating the covenant for renewal, but permits only one renewal, yet in the opinion of Judge Stone the opposite view seems to have been taken. Reference to the record in Stewart vs. Gorter shows that the covenant for renewal involved there was substantially the same as that in the present lease, and Judge Stone, page 245, speaks of the covenant that the second lease should contain the same covenants as a covenant "that the lease should be renewed for another fourteen years; thus making the lease of indefinite duration, and placing it upon the same footing as the ordinary long lease." The point was not necessary to the decision of that case, however, and, as I think, is unimportant here.

My conclusion is, therefore, that the case of Stewart vs. Gorter in respect to the particular question under discussion, and that the lease for a term of ten years, with a covenant for renewal for another ten years, was, during the existence of the original term, at least, to be treated for the purposes of this case as one which was from the beginning a lease for more than fifteen years. So far we have not taken up the question whether the second term provided for under the lease is now running.

There is a difference between this case and the case of Stewart vs. Gorter in that here the original term has long since expired, and if there is any term running to which the right of redemption may attach, it must be the second or renewed term. And counsel for the landlord have argued that, however the case may be on the first term, on the second or renewed term, with no renewal in prospect to carry the tenancy to fifteen years and more, the statute cannot apply. This is based upon an assumption that the courts in Maryland would concur in what has been described as the universally recognized rule, that only one renewal is provided for under the covenant. It seems to me there is plausibility in this argument, and it cannot be rejected unhesitatingly; but my conclusion is rather that the decisions of the Court of Appeals lead in the other direction, toward the theory that the statute provides for redemption at any time from the beginning of the lease to the end of the period, "more than fifteen years," which is construed to be within the operation of the statute. So I take this point to have been decided once we have decided that a lease for a shorter term, with a privilege of renewal, must be treated as equivalent, for the purposes of the statute, to a term for more than the specified fifteen years.

But, after all, are the parties in this particular case to be treated as having entered upon the second or renewed term of ten years provided under the lease, and so to be holding on under a tenancy affected by the statute? The tenant, assignee of the original tenant, gave notice of an intention to renew under the covenant a year before the expiration of the original term. The landlords, without admitting a right to such a renewal offered a new lease, but this was refused by the tenant, who, through its attorney, replied that it intended to avail itself "of the right of renewal of the present lease in the manner and for the term therein provided." There was no further discussion, and no actual renewal was made, and after the expiration of the first ten years the tenant merely continued

occupying the premises and paying the rent as usual. Seven years later, in November, 1921, it gave notice to the landlord of intention to redeem; and the landlord answered that the right did not exist. The landlord contends that the tenant, under the law, has held over only from year to year.

Obviously, unless there has been a renewal under the covenant, holding over must under the strict law give rise to no more than a tenancy from year to year, perhaps only to a tenancy at will. Under a lease with the covenant, however, the tenant has ordinarily an equitable right to enforce renewal, or as Jessel, M. R., put it in the case quoted earlier, "an equitable estate," which is generally as effective as an actual renewal. We rarely find a case in which this principle, being necessary to justice under the circumstances, has not controlled. It is a principle of equity only (Review of authorities in 123 Amer. St. Rep. 465, and 16 R. C. L., Sec. 389). And in so far as the court of equity may be appealed to in this case to build up a renewal for the tenant for the purpose of enabling him to secure the advantages of redemption, I am quite clear the application should be denied as being opposed to equity and justice, for reasons which will be dwelt upon more at length later on. But it is contended by the tenant that the parties themselves have established the renewed tenancy by the continuation in the same relation. The tenant made clear from the start its purpose to hold on for the renewed term, and while the landlord did not agree to the renewal, the holding has run on for seven years more. There is a difference of opinion in this country as to relation to be presumed from a holding over other than by an actual renewal; but I think the Court of Appeals has disposed of the question for this State in the case of Feldmeyer vs. Werntz, 119 Md. 285, 294. The view taken here seems clearly to be that a repetition of the old lease with the full term is presumed. The presumption is one of fact. Of course, the parties may be shown to be holding with quite a different intention (Authorities collected in 29 L. R. A., N. S., 174; 112 Amer. St. Rep. 754; Ann. Cas. 1915D, 252; 6 Ann. Cas. 342; 24 Cyc. 1018). But the offer of the landlord in reply to the tenant's notice of election to renew, is not, in my opinion, such as would, ordinarily, at least,

stop the presumption that the parties themselves renewed the lease. Doubtless the landlord did mean to stand out against the idea that the lease should be renewed so as to carry the right of redemption. Then, as now, he doubtless opposed this development as something at odds with the contract, unexpected and consequently unfair to him. There, of course, lies the real grievance in these cases, and from it comes the question which seems to me to stand to the front in any inquiry on other points. A brief review will present it more fully.

The redemption statute was enacted, first in 1884, only with a view to stopping the irredeemable ground rent. From all that I can discover it never entered anybody's head then, or for a long time after, that it would affect anything but the familiar leasehold ownership of land subject to a ground rent, or that it would allow the redemption of anything but this charge, under the guise of a fee-simple or reversionary ownership. No one seems ever to have found a lease for occupancy of a building made to conform to the operation of the redemption statute. There were long building leases made then, although not so many as in later years. There has been an increase in the scale of business enterprises, and long tenancies are economic essentials to more and more of them; so it has become more and more common to find agreements for long occupancy. And, of course, there are covenants in great variety for balancing the interests of the parties on one side and the other, in the various leases. So far as I have learned, it was not until about 10 years ago that some question was raised as to the applicability of the ground rent redemption statutes to these long leases. In the opinion filed in the court below in the case of Brager vs. Bingham, it was remarked that the view that the statute might be applicable was somewhat widely held. I think in fairness to the landlord I ought to correct that statement; I have been assured that it is wrong, and that the opinion or apprehension was entertained by few lawyers. There was some reason for the apprehension, for, as has been observed, the letter of the statutory provision included broadly all leases of land of the specified length. At any rate, the apprehension seems to have produced no change in the number and variety of

covenants in any of the landlord and tenant leases. In 1914, Chapter 371, the Legislature started to protect all future leases of buildings from application of the statute; but, of course, there were many leases in existence before that, and many now in existence unaffected by the Act of 1914. The lease in this case is one of them. And when it was decided, in 1915, that the redemption statute included these leases in its operation, many letters of property were caught unawares, and placed in a much embarrassed situation. Entirely unexpected by them, their properties were found tied up under agreements unadapted to any plan of redemption, especially on the basis of rent, or whatever was so denominated under one of several covenants. Redeeming on that basis alone would put into the hands of tenants power to throw overboard any one or all of a great variety of other covenants which have been, are, and always will be, necessary in adjusting the demands which arise in the letting of one property and another in the ordinary course of business. The hardship which this brings upon landlords is obvious, and we need hardly spend any time in elaboration or illustration of the fact. Here, as in Banks vs. Haskie, 45 Md. 218, 219, "it is easy to see on which side of such a case substantial justice lies." The real question, which seems to me to overlie all others in the case, is whether there is any counter-rule or policy which lays the law prostrate and impotent before the injustice which will result from an unanticipated application of the statute. The law has gone so far as to attach the right of redemption of rent to any lease with a total term of more than fifteen years, so that if the parties here are to be treated as having renewed their term they are affected, along with all other parties in similar situations, no matter how much injustice may have to result to landlords from it. I think, as has been said, that a court of equity should not exert itself to bring within this class a tenant not already in it, on strict law. It should not build up a renewal in order to enable the tenant to bring his tenancy within the operation of the statute for the purpose of seizing the unexpected and unfair advantage which would now accrue by it. There may be an element of estoppel, or an equitable process in operation, in the presumption which makes a holding over with the acquiescence of the landlord the equivalent of a renewal; and if there is any such element, then I should say here, too, equity should in the words of an old English judge, stand neutralized. But I rather think that if we should put aside the presumption in this case we should be impairing a good rule in order to give effect to an objection on another ground, the real ground. And that is, as has already been stated, the objection that it is inequitable to subject the landlords to loss and injury for failure to anticipate a holding of the courts on a point of law. It is an objection, of course, which may be analyzed as one based on a mistake or misconception of law. Assuming this to be a correct description of the failure of anticipation—although it is unlike the misconception in any one of the decided cases I have seen on that branch of law—does it bar the landlords from consideration and protection of the law? The rule that ignorance or mistake of law disentitles a man to protection is one which can be handled only with diffidence nowadays. It has been so narrowed down in modern decisions that it is by no means easy to say what is left of it. There is no court which has not had to make exceptions. In Maryland we have, for instance, the cases of Prince de Bearn vs. Winans, 111 Md. 434, 477, and Godwin vs. Da Conturbia, 115 Md. 488. So many and varied are the exceptions, indeed, that they have defied classification and left us a rule which is a rule only in situations undefined—and that is hardly a rule at all. The maxim upon which it is based, *ignorantia juris non excusat*, has had a long history in Europe and America, but not so long in its absolute form. In France and Germany it has been completely discarded, and in England, it seems, whittled away by exceptions. A review of its career in Europe is given in an article on "Error of Law," in 7 Columbia Law Review 476-519.

"This maxim," says the author, "may be likened to the genie of the Arabic tale who on being released from long captivity in his brazen capsule arose in a cloud of smoke to obscure the sun, cause darkness and confusion below and terrify his liberator; because in its translation and application it has thrown a weird spell upon the law of Christendom, involved its interpreters

154

in dissentious argument, and at times enveloped bench and bar in an impenetrable mantle of perplexity and doubt."

A note in 66 Central Law Journal 373 says: "The rule is well settled that equity will not relieve against mistakes of law, but there are so many exceptions to the rule that no little confusion has resulted. Where justice demands it, the courts have ever been ready to find ground for an exception to the rule, which will give relief. The rule is stated as follows in 16 Cyc. 75: "No general principle can be stated which will harmonize the cases. While the rule has been too often declared to be ignored, it seems to be founded on misconception of the maxim to which it is addressed and the efforts of the courts to engraft exceptions have led practically in many cases to an annulment of the rule itself."

And again in 14 Virginia Law Register 136: "An examination of the authorities will show that the general rule that equity will not correct a mistake of law has been so greatly modified that considerable doubt seems to exist as to whether it can now be called a general rule."

The continued pronouncement of it as a rule still existing has been referred by one writer to a "lack of frankness on the part of the courts" (32 Harvard Law Review 285) but the courts cannot discard a general principle until its complete inutility has been demonstrated or the limits of its utility defined. This has not quite been done. Another generation will probably do the discarding.

Hardship is, of course, always the special concern of equity, and it has no concern with a distinction between mistakes of law and mistakes of fact, except when called upon to relieve of hardship (6 Pomeroy's Equity Juris, Remedies, Sec. 783). And so many have been the exceptions to the old distinction that we find courts saying that "the important question is not whether the mistake was one of law or of fact, but whether the particular mistake was one which a court of equity will correct; and this depends on whether the case falls within the fundamental principle of equity, that no one shall be allowed to enrich himself unjustly at the expense of another by reason of an innocent mistake of law or of fact, entertained by both

parties." 10 R. C. L., "Equity," Sec. 50, etc.; Benson vs. Markoe, 37 Minn. 30.

The case here has several aspects, but one seems to me especially important. The law was at least unsure before the decision in Brager vs. Bingham. It was the opinion of a large part of the legal profession and of people generally that the redemption statute had no bearing at all on ordinary landlord and tenant leases. Referring to its words, "all leases of land," it was obvious that there alone was to be found no application to such leases; obviously there were many sorts of leases of land to which it could hardly be applied, as, for instance, the leases concerned in Buckler vs. Safe Deposit Co., 115 Md. 222, and Walker vs. Washington Grove Assn., 127 Md. 564. Other instances have been suggested in pier leases, leases for ways and some others besides leases of buildings. If the statute were ever to be applied to any of these various leases, the application could be only by way of an opinion of the Court of Appeals, in deciding one concrete case or another as it might arise. While this is a perfectly proper function to be left to the courts, it is one which unfortunately puts them in a position of some embarrassment because of the fact that their applications must relate back. They are put in a position to entrap, unless it is also within their power to give equitable relief from the hardships which must necessarily follow such a process. And I venture to think that something like fairness to the judicial department, as well as all considerations of decency in the administration of the law, requires that this function of the judges carry with it freedom to grant relief in a clear case from any considerable hardship consequent upon the decision of a case one way or the other, that is, the hardship from failure to anticipate that the minds of the judges would incline in such and such a way. Indeed, I see no way to avoid the conclusion that there can be no rule or policy to the contrary which would justify a denial to the law of the power to remedy the injustice, and that we should do no honor to the law by denying it. For this reason, I venture the opinion that the landlords in these cases should not be held to have obligated themselves

so that redemption may be enforced upon them. There is no fear of a consequential letting down of necessary bars; the Legislature has now let down the bars as to all but leases in the past. The courts cannot, of course, restrain the operation of the statute as to these old leases. But the power to reform and reconstruct contracts to fit the actual undertakings of the parties, and to meet the demands of justice under the circumstances, seems to me, to be ample. It is the regular practice of equity to make its remedies ample to accomplish these ends. The decided cases furnish abundant precedents for interposition even more far-reaching. Relief has been granted from covenants in contracts merely because they have turned out to entail harsh, unintended consequences, and again from covenants merely because inadvertently made (2 Pomeroy's Equity Jurisp., Secs. 791 and 792). The form of relief might, if necessary, be a decree for a new and distinct lease for the second term; or it might take the form of a mere refusal to enforce the implied lease to the full extent. The reasoning just set out seems to me to require a refusal of the application of the complainant in the one form or the other, and in this court it will be so decreed.

So much is, as I see it, sufficient to dispose of the case. But there is one other question which was argued, and which has not been touched upon, and as in a case of so much importance the judge of the lower court is in about the position of master in chancery to the Court of Appeals, it may not be amiss for me to record the results reached by me on that point. If it is decided that the tenancy is now affected by the statute, and the redemption of the lease enforceable under it, then what would be capitalized, the amount denominated "rent" under the lease, or that amount and, in addition, the further periodical payments required to be made with the increase of taxes and insurance premiums during the term, and to be applied to the taxes and insurance? The statute provides for redemption on the basis of the "rent reserved." The difficulty arises from the fact that in using the phrase "the rent reserved" the framers of the statute started with only a ground rent in mind. That is the usual phrase in references to a ground rent. The whole

interest of the landlord was summed up in that rent, and redemption of it upon a fair capitalization closed accounts between the two sides completely and fairly. This is not so in the case of the ordinary relation of landlord and tenant. In this latter relation the landlord is the real owner of the land; he is the man upon whose ownership the ground rent is charged. In the exploitation of his property, he must from time to time covenant for a variety of considerations and obligations entirely beyond the concern of a mere ground rent owner. This is necessary for both the landlord and the tenant, the law protects them in their covenants, and it would clog the letting and renting of premises with hardship to both tenants and landlord if they should be denied freedom to adopt any covenants they find desirable in their business arrangements. Now, if we construe it to have been the intention of the Legislature that the redemption statutes should also apply to the arrangements between these parties, what shall we construe to be the "rent reserved"? Must we always construe it to mean that which the parties have denominated rent, the definite sum of money payable to the landlord under that name? Obviously, if we do then we must either deny the parties freedom to embody beneficial covenants in any other form, or we give the tenant the right to expunge them. That is the practical alternative. Must we not rather say that the Legislature intended the statute to apply fitly or not at all? The Legislature certainly intended to provide for a complete, just dissolution and settlement of the legal relation. When they spoke of rent they certainly meant everything belonging to the owner of the rent. My conclusion is that the application of the statute to these leases compels us to find a basis for just resolution as far as it is possible to do so. In so far as the tenants are permitted to expunge fair covenants the court fails to accomplish the purpose which must be presumed to have been intended by the Legislature.

In this particular case the owner of the property stipulated for a rent of $15,000 and additional amounts to be paid, as has been said, to meet increases in taxes and insurance premiums, these additional amounts hav-

ing now reached a total of $9,555.69 yearly. These additional amounts, if they could have been fixed at the beginning, would undoubtedly have gone to increase the amount then stipulated for as rent, for it was the obvious purpose to make the return cover the burden of the landlord during the lease. It seems to me, then, that they are fairly to be considered his rent. They are exactly that, for, with the first sum stipulated as rent, they make up strictly in accordance with the intention of the parties the amount of return calculated to balance the landlord's interest and to induce him to let his property for occupancy; and that, in the final analysis, is rent. At the outset the parties had a choice of arrangements. They might fix a much larger sum as rent payable from the beginning, estimated on a guess, to make allowance for future increases of value and of the burden of taxes, or they might fix a rental fair at the time and then provide for increases to meet increases of value and taxes, as they might come along in the future. If the parties had adopted the former plan, it would have been in the nature of a gamble, and much less satisfactory. The latter plan, the one they did adopt, seems to give them the same thing in a fairer, more accurate form, and to be more desirable for that reason. To say that only the sum fixed in advance, under the former plan and denominated "rent," can be treated as rent for the basis of redemption, would, it seems to me, be placing everything on a word to the exclusion of the clear reality. It may be a broad treatment of the letter of the statute to construe thus the reference to rent reserved, but it is certainly no broader than the constructions necessary to except the leases which have been excepted from the statutory reference to "leases of land." And as I see it, it is the only construction consistent with the just purpose of the statute, and, indeed, the only one which would avoid a real perversion of that purpose.

If the redemption prayed for were to be allowed I should, upon this reasoning, take as the basis of capitalization the whole sum of amounts payable under the lease. Either there should be no redemption of this lease, or there should be a redemption only on the basis of the full money return.

But as I have said, my conclusion is that there should be no redemption. The decree in accordance with this conclusion will deny the prayer for specific performance. It seems to be it will be sufficient merely to dismiss the bill of complaint, but if counsel prefer it I see no objection to a provision that the landlord shall upon demand of the tenant, execute a new lease to give the tenant full protection in all the rights for which it actually contracted.